## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PERFORMANCE COAL COMPANY and ALLEN GUTHRIE & THOMAS, PLLC,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:10-cv-01698-RJL** |
| | ) | |
| **U.S. DEPARTMENT OF LABOR and MINE SAFETY AND HEALTH ADMINISTRATION,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND MOTION FOR DISCOVERY

Robert D. Luskin, D.C. Bar # 293621
Benjamin D. Wood, D.C. Bar # 478799
Edward D. Gehres, III, D.C. Bar # 478565
Haven G. Ward, D.C. Bar # 976090
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C.  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

STANDARD OF REVIEW....................................................................................................2

ARGUMENT...........................................................................................................................3

    I.      DOCUMENTS RELATED TO THE "WAGNER MEMORANDUM"
           ARE NOT PRIVILEGED........................................................................................3

          A.      DOL Cannot Claim the Attorney-Client Privilege. ...........................5

                  i.        *DOL Did Not Seek Legal Advice.* ...................................5

                  ii.      *DOL Waived the Attorney-Client Privilege through Deliberate
                         Disclosure to the Media.* ..................................................8

                  iii.     *DOL's Belated Claim that a "Memo Is Not a Memo" Is
                         Disingenuous.* .................................................................9

          B.      DOL Cannot Withhold the Requested Information under the Work-
                Product Privilege. ..............................................................................10

                  i.        *The Work-Product Privilege Does Not Apply.* ...............10

                  ii.      *DOL Waived the Work-Product Privilege.* .....................11

          C.      The Deliberative-Process Privilege Offers DOL No Shelter.........13

                  i.        *The Plick Declaration and Attached Vaughn Index Do Not Establish
                           that the Deliberative-Process Privilege Applies.*................14

                  ii.      *DOL Waived the Deliberative-Process Privilege.* ............15

    II.     MSHA DOES NOT DEMONSTRATE THE HARM REQUIRED TO
           WITHHOLD DOCUMENTS UNDER EXEMPTION 7(A). ..................16

          A.      MSHA Fails to Explain How the Release of Already Public Eight-
                Year-Old Investigation Results Will Harm the Current Investigation...........18

                  i.        *MSHA Cannot Credibly Claim that Release of Witness Names Will
                           Harm the Investigation.*....................................................18

                  ii.      *MSHA Cannot Demonstrate Harm Because It Has Already Released
                            the Substance of the 03/04 Methane Outburst Documents.* ...........20

          B.      Disclosure of the Hardman Transcripts Would Not Harm the

        Investigation. ...................................................................................................22

           i.     *MSHA Does Not Demonstrate Any Concrete Harm*...................................22

           ii.     *MSHA Waived the Protections of Exemption 7(A).* ....................................24

           iii.     *MSHA Did Not Segregate All Releasable Information.* ...............................25

      C.     MSHA Does Not Justify Withholding One Page from the MPAS
           Request Production. ..........................................................................................26

           i.     *The MPAS Document Was Not Compiled for a Law Enforcement*
                  *Purpose.*..............................................................................................26

           ii.     *MSHA Does Not Distinguish This One Page from the Thousands of*
                  *Pages It Has Released.* ....................................................................26

           iii.     *Conclusory Allegations Are Not Enough.* ......................................................27

   III.     MSHA DOES NOT JUSTIFY WITHOLDING INSPECTORS' NAMES
        UNDER EXEMPTION 7(C). ............................................................................28

   IV.     NEITHER MSHA NOR DOL CONDUCTED ADEQUATE SEARCHES
        IN RESPONSE TO PERFORMANCE'S FOIA REQUESTS..................................30

      A.     Defendants Do Not Sufficiently Explain the Search Methodologies
           Used to Locate Responsive Documents................................................................31

      B.     Defendants Improperly Narrowed Performance's FOIA Requests. ..............33

      C.     The Near Total Absence of Entire Categories of Documents
           Demonstrate the Inadequacy of Defendants' Searches for Responsive
           Documents.........................................................................................................35

           i.     *April 5th Timeline*...................................................................................35

           ii.     *Humphrey and Wills "Report of Investigation (Underground Coal*
                  *Mine): Methane Inundation."* ........................................................36

           iii.     *Email*.....................................................................................................36

           iv.     *Photographs and Other Visual Depictions*....................................................38

V.     MSHA MISCONDUCT, INCLUDING DOCUMENT DISTRUCTION, WARRANTS
     DISCOVERY………………………………………………………………………..39

CONCLUSION.......................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Animal Legal Defense Fund, Inc. v. Dep't of the Air Force,*
   44 F. Supp. 2d 295 (D.D.C. 1999) ..................................................................................15

*Army Times Publ'g Co. v. Dep't of the Air Force,*
   998 F.2d 1067 (D.C. Cir. 1993) ...............................................................15, 16, 25, 27

*Baker & Hostetler LLP v. U.S. Dep't of Commerce,*
   473 F.3d 312 (D.C. Cir. 2006) ...................................................................................30

*Bonaparte v. United States Dept' of Justice,*
   531 F. Supp. 2d 118 (D.D.C. 2008) ..................................................................... 31, 32

*Burton v. R.J. Reynolds Tobacco Co.,*
   170 F.R.D. 481 (D. Kan. 1997) ....................................................................................7

*Burton v. R.J. Reynolds Tobacco Co.,*
   200 F.R.D. 661 (D. Kan. 2001) ....................................................................................7

*Calvin Klein Trademark Trust v. Wachner,*
   198 F.R.D. 53 (S.D.N.Y. 2000) ...............................................................................7, 11

*Chesapeake Bay Foundation, Inc. v. U.S. Army Corps of Engineers,*
   722 F. Supp. 2d 66, 73 (D.D.C. 2010)......................................................................6, 7

*City of Springfield v. Rexnord Corp.,*
   196 F.R.D. 7 (D. Mass. 2000).......................................................................................7

*Coastal States Gas Corp. v. Dep't of Energy,*
   617 F.2d 854 (D.C. Cir. 1980) ...........................................................................*passim*

*Cottone v. Reno,*
   193 F.3d 550 (D.C. Cir. 1999) ............................................................................. 24, 25

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,*
   331 F.3d 918 (D.C. Cir. 2003) ............................................................................. 20, 26

*Dep't of Interior v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001) ......................................................................................................3, 15

*Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
   489 U.S. 749 (1989) ............................................................................................ 3, 28, 39

*Dorsey v. EEOC,*
   No. 09CV519 BEN (AJB), 2010 WL 3894590 (S.D. Cal. Sept. 29, 2010).......................32

*E.I. DuPont De Nemours & Co. v. Kolon Industries,*
  269 F.R.D. 600 (E.D. Va. 2010) ................................................................................*passim*

*FBI v. Abramson,*
  465 U.S. 615 (1982) ................................................................................................... 17

*Fisher v. United States,*
  425 U.S. 391 (1976) ..................................................................................................... 5

*Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency,*
  610 F.2d 824 (D.C. Cir. 1979) ..................................................................................*passim*

*Freeport-McMoran Sulphur, LLC v. Mike Mullen Energy Equip. Res., Inc.,*
  No. 03-1496, 2004 WL 1299042 (E.D. La. June 4, 2004) ......................................... 11

*In re Bisphenol-A (BPA) Polycarbonate Plastics Prods. Liability Litig.,*
  No. 08-1967-MD-W-ODS, 2011 WL 1136440 (W.D. Mo. Mar. 25, 2011) ................. 7

*In re Chevron Corp.,*
  749 F. Supp. 2d 141 (S.D.N.Y. 2010) ....................................................................... 11

*In re Sealed Case,*
  192 F.3d 995 (D.C. Cir. 1999) ................................................................................... 13

*In re Sealed Case,*
  29 F.3d 715 (D.C. Cir. 1994) ...................................................................................... 8

*In re Sealed Case,*
  676 F.2d 793 (D.C. Cir. 1982) ............................................................................. 10, 13

*In re Veiga,*
  746 F. Supp. 2d 27 (D.D.C. 2010) .........................................................................8, 10

*Jefferson v. Reno,*
  123 F. Supp. 2d 1 (D.D.C. 2000) ......................................................................... 40, 43

*Juarez v. Dep't of Justice,*
  518 F.3d 54 (D.C. Cir. 2008) ..................................................................................... 25

*Judicial Watch, Inc. v. Dep't of Commerce,*
  34 F. Supp. 2d 28 (D.D.C. 1998) .............................................................................. 40

*Judicial Watch, Inc. v. Dep't of Homeland Sec.,*
  598 F. Supp. 2d 93 (D.D.C. 2009) .............................................................................. 3

*Krenning v. Hunter Health Clinic, Inc.,*
  166 F.R.D. 33 (D. Kan. 1996) ..................................................................................... 8

*Lion Raisins, Inc. v. Dep't of Agriculture,*
    636 F. Supp. 2d 1081 (E.D. Cal. 2009) ................................................................ 40, 42

*Long v. Dep't of Justice,*
    10 F. Supp. 2d 205 (N.D.N.Y. 1998) ......................................................................40

*Maydak v. Dep't of Justice,*
    218 F.3d 760 (D.C. Cir. 2000) ................................................................................17

*Mead Data Cent. v. Dep't of the Air Force,*
    566 F.2d 242 (D.C. Cir. 1977) ....................................................................... 5, 6, 14

*Morley v. CIA,*
    508 F.3d 1108 (D.C. Cir. 2007) ..................................................................... 19, 25

*Nation Magazine v. U.S. Customs Serv.,*
    71 F.3d 885 (D.C. Cir. 1995) ..................................................................................33

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ................................................................................................14

*North v. Walsh,*
    881 F.2d 1088 (D.C. Cir. 1989) .............................................................................20

*Perry-Torres v. Dep't of State,*
    404 F. Supp. 2d 140 (D.D.C. 2005) (Leon, J.) ......................................................16

*Petroleum Info. Corp. v. Dep't of Interior,*
    976 F.2d 1429 (D.C. Cir. 1992) ..............................................................3, 13, 19, 27

*Piper v. Dep't of Justice,*
    294 F. Supp. 2d 16 (D.D.C. 2003) .................................................................. 31, 41

*Pratt v. Webster,*
    673 F.2d 408 (D.C. Cir. 1982) ........................................................................ 17, 26

*Renegotiation Bd. v. Grumman Aircraft,*
    421 U.S. 168 (1975) ................................................................................................13

*SafeCard Servs. v. SEC,*
    926 F.2d 1197 (D.C. Cir. 1991) ...................................................................... 14, 19

*Steinberg v. Dep't of Justice,*
    23 F.3d 548 (D.C. Cir. 1994) ...........................................................................3, 31, 33

*Stern v. FBI,*
    737 F.2d 84 (D.C. Cir. 1984) .........................................................................28, 29, 30

*Stolt-Nielsen Transp. Group LTD v. United States*,
    534 F.3d 728 (D.C. Cir. 2008) ............................................................................................ 19

*Sussman v. United States Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ...................................................................... 17, 20, 25

*United States v. Deloitte LLP*,
    610 F.3d 129 (D.C. Cir. 2010) ........................................................................... 10, 12

*United States v. Philip Morris USA, Inc.*,
    No. 99-2496(GK), 2004 WL 5355972 (D.D.C. Feb. 23, 2004) ......................................... 7

*United States v. Thompson*,
    562 F.3d 387 (D.C. Cir. 2009) ........................................................................... 11, 13

*UtahAmerican Energy v. Dep't of Labor.*
    700 F. Supp. 2d 99 (D.D.C. 2010) (Leon, J.) ..................................................... *passim*

*UtahAmerican Energy, Inc. v. MSHA,*
    725 F. Supp. 2d 78 (D.D.C. 2010) .................................................................. 33, 34, 38

*Weisberg v. United States Dep't of Justice.*
    627 F.2d 365 (D.C. Cir. 1980) ..................................................................................... 31

*Wilderness Soc'y v. Bureau of Land Mgmt.,*
    No. 01-2210, 2003 WL 255971 (D.D.C. Jan. 15, 2003) ............................................. 31, 33

*Wilderness Soc'y v. Dep't of the Interior,*
    344 F. Supp. 2d 1 (D.D.C. 2004) ................................................................................. 30

## STATUTES

Freedom of Information Act, 5 U.S.C. § 552 ......................................................... *passim*

30 U.S.C. § 801(a) ......................................................................................................... 21

## OTHER AUTHORITIES

Fed. R. Civ. P. 56 ............................................................................................ 1, 2, 39, 40

J. Wigmore, EVIDENCE IN TRIALS AT COMMON LAW § 2327 (J. McNaughton rev. 1961) .................. 13

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Performance Coal Company and Allen Guthrie & Thomas, PLLC (collectively, "Performance") respectfully submit this Memorandum of Law in Support of their Opposition to Defendants U.S. Department of Labor ("DOL") and Mine Safety and Health Administration's ("MSHA") (collectively, "Defendants") Motion for Partial Summary Judgment, Performance's Cross-Motion for Partial Summary Judgment, and Motion for Discovery.

## INTRODUCTION

Although the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), has long been an important part of transparent and accountable government, the Obama administration recently emphasized that government agencies are to respond to FOIA requests with a presumption of openness and disclosure.  Pls. Statement of Undisputed Material Facts ¶¶ 2-3 ("SUMF"). Defendants, while publicly committing to the President's bold and uncompromising vision for FOIA, have made a mockery of that vision in responding to Performance's FOIA requests.  MSHA boasts of needing only 17-to-31 days, on average, to process complex FOIA requests that result in the disclosure of information.  *Id.* ¶ 1.  But its average response time for Performance's requests is **256 days**.

Following a tragic accident on April 5, 2010 ("Accident") at Performance's Upper Big Branch Mine ("Mine"), Performance—which has committed itself to conducting a rigorous and thorough investigation of the cause of the Accident—submitted discrete FOIA requests to assist the company with its Accident investigation.  Specifically, Performance sought information regarding: (1) rock dusting at the Mine; (2) plans for operating the Mine that are maintained in MSHA's Mine Plan Approval System ("MPAS"); (3) methane outbursts at the Mine on July 3, 2003 and February 18, 2004; (4) a methane ignition at the Mine on January 4, 1997; (5) air testing conducted at the Mine; (6) a publicly released memorandum prepared by MSHA Deputy Assistant Secretary for

Policy Gregory R. Wagner to DOL Solicitor of Labor M. Patricia Smith about, *inter alia*, ventilation at the Mine; (7) a publicly released timeline of events at the Mine on the day of the Accident; and (8) a publicly released interview with then-MSHA District 4 Manager Bob Hardman about events surrounding the Accident.[1]   Each of these requests focused on specific issues related to Performance's investigation into what caused the Accident.

Defendants, however, did not produce **a single document** until after Performance filed suit.  And, when Defendants finally did produce some documents, they withheld many under broad and largely unsubstantiated claims of FOIA Exemptions 5, 7(A), and 7(C).  Put simply, Defendants claim the protection of privileges when either none existed or they were waived by Defendants' calculated and opportunistic public disclosure to third parties and the press.  Moreover, the declarations submitted to explain and substantiate the adequacy of Defendants' searches for responsive documents and claims of exemption are insufficient as a matter of law.  These categorical failures require the entry of summary judgment in Performance's favor.

Finally, beyond the legal failings of Defendants' motion for partial summary judgment, limited discovery is necessary to determine the scope of MSHA's misconduct in responding to Performance's FOIA requests.  There is credible evidence that an MSHA employee intentionally destroyed documents responsive to at least one of Performance's FOIA requests.  In addition, MSHA repeatedly claims that certain documents do not exist when the evidence irrefutably shows these claims to be false.  Depositions of several key staff members thus are necessary to determine the scope of MSHA's malfeasance.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.

---

[1] The Mine is located in MSHA Coal Mine Safety and Health District 4.

A court must draw all inferences in the non-movant's favor, keeping in mind that in FOIA cases "the burden is on the agency to show that requested material falls within a FOIA exemption." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (internal quotation marks and citations omitted); *see also Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994); *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 95 (D.D.C. 2009).

Because "disclosure, not secrecy, is the dominant objective of" FOIA, all "exemptions have been consistently given a narrow compass." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (citations omitted). Where the agency cannot meet its burden to demonstrate that it has properly withheld the contested information, summary judgment in favor of the requester is appropriate. *Petroleum Info. Corp.*, 976 F.2d at 1433.

## ARGUMENT

Defendants cannot demonstrate proper invocation of FOIA's limited exemptions, the release of all reasonably segregable information, and the completion of an adequate search of their files for the requested documents. The record demonstrates that Defendants withheld information from Performance without a valid legal basis while repeatedly making selective disclosures of requested information to the press and favored third-parties as part of a concerted public relations campaign. Rather than embracing FOIA's stated purpose of allowing citizens to know "what their government is up to," MSHA has demonstrated bad faith with regards to these FOIA requests, including the apparent destruction of requested documents. *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citation omitted) (emphasis in original). Performance therefore is entitled to summary judgment, an order directing Defendants to release all contested information, and discovery to determine the scope of MSHA's document destruction.

## I.   DOCUMENTS RELATED TO THE "WAGNER MEMORANDUM" ARE NOT PRIVILEGED.

On July 21, 2010, DOL leaked a memorandum by MSHA Deputy Assistant Secretary for

Policy Gregory R. Wagner to DOL Solicitor of Labor M. Patricia Smith (the "Wagner Memorandum") to the global news wire service the Associated Press ("AP").  SUMF ¶ 45.  The Wagner Memorandum was expressly written for the purpose of dissemination to the press as part of Defendants' public relations response to certain statements about ventilation planning in the Mine.[2] Defendants' FOIA Counsel, Joseph Plick, states unapologetically: "[I]n an effort to publicly respond to Massey's claims, on or about July 20, 2010, DOL provided its response to the news media." Declaration of Joseph Plick ("Plick Decl.") ¶ 6.

Email correspondence confirms the explicit details of Defendants' efforts.  On July 20, 2010, Sam Hananel, a news reporter for the AP, emailed Carl Fillichio, a senior advisor to DOL Secretary Hilda Solis, stating that Mr. Hananel had not "received the memo yet."  SUMF ¶ 44.  Mr. Fillichio responded by email that very afternoon with the text of the "draft" memo pasted into the body of the email message.  *Id.*  The next day, Mr. Fillichio made a point to follow up his first message to Mr. Hananel by providing the AP with the "final memo language."  *Id.* ¶ 45.  Mr. Hananel then authored a story released on the AP's global wire service detailing DOL's response to ventilation issues and referring extensively to the Wagner Memorandum.  *Id.* ¶ 43.

DOL also shared the Wagner Memorandum with other interested journalists, such as prolific coal industry blogger Ken Ward, Jr. of *The Charleston Gazette* and James Sharpe of the mining newsletter *Sharpe's Point*.  *Id.* ¶¶ 46-47.  Indeed, Mr. Ward reported extensively on the Wagner Memorandum and his correspondence with DOL public relations officer Amy Louviere in several blog entries on July 22, 2010.  *Id.* ¶ 46.  Mr. Ward confirms that Ms. Louviere provided him with the final version of the Wagner Memorandum, which he characterizes as "a memo clearly written to be

---

[2] Despite MSHA's portrayal of Dr. Wagner as its ventilation guru, Dr. Wagner's actual field of expertise is occupational diseases.  *See Information About the Deputy Assistant Secretary for Policy, Mine Safety and Health Administration*, available at http://www.msha.gov/DASOpsPolicy.asp.   This is further evidence that Dr. Wagner's memorandum was purely a public relations gambit.

leaked" as part of a public relations effort.  *Id.* ¶ 46.

Put simply, the Wagner Memorandum is a press release written under the guise of a "leaked" intra-agency memorandum.  It stretches the bounds of common sense that DOL now attempts to shield documents related to the Wagner Memorandum with claims of attorney-client, work-product, and deliberative-process privileges under Exemption 5.  *See* Defs. Br. at 25-31.  None of these asserted privileges apply to the withheld documents.  Even if this Court were to hold that the asserted privileges apply, they were unequivocally waived.

### A.      DOL Cannot Claim the Attorney-Client Privilege.

DOL cannot protect the withheld documents with claims of attorney-client privilege.  The attorney-client privilege only protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) (footnote omitted).  DOL cannot demonstrate that the communications regarding the Wagner Memorandum were: (1) for the purpose of gaining legal advice; and (2) kept confidential at all times.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862-63 (D.C. Cir. 1980).  The communications at issue were part of a public relations strategy discussion and did not pertain to legal advice.  And DOL's concerted efforts to transmit the Wagner Memorandum literally worldwide destroys any shred of the documents' confidentiality.

### i.      DOL Did Not Seek Legal Advice.

The attorney-client privilege "does not allow the withholding of documents simply because they are the product of an attorney-client relationship." *Mead Data Cent.*, 566 F.2d at 253.  Rather, it "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Coastal States Gas*, 617 F.2d at 862 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

Here, the purpose of communications regarding the Wagner Memorandum was for public relations advice, not legal advice.  DOL concedes: "**[I]n an effort to publicly respond** to Massey's claims, on or about July 20, 2010, DOL provided its response [(Wagner Memorandum)] to the news media."  Plick Decl. ¶ 6 (emphasis added).  It also concedes: "MSHA, the client agency, sought advice from the Solicitor of Labor about the appropriate method to utilize **in responding to** Massey's allegations while ensuring appropriate mine safety enforcement."  Plick Decl. ¶ 28 (emphasis added).  Moreover, the few emails that DOL did produce confirm the singular public relations focus of all efforts related to the Wagner Memorandum.  A senior advisor to Secretary Solis orchestrated the release of draft and final versions of the Wagner Memorandum text to a global news wire service.  SUMF ¶¶ 44-45.  After its initial release, DOL public relations specialists took over, transmitting it to reporters who requested it on the heels of the AP's story.  *Id.* ¶¶ 46-47.  DOL thus has not articulated any meaningful grounds for the existence of the attorney-client privilege: advice regarding the crafting of a press release is not "legal advice."

This Court rejected application of the attorney-client privilege in similar circumstances.  In *Chesapeake Bay Foundation, Inc. v. U.S. Army Corps of Engineers*, the Court considered whether "an email exchange among [U.S. Army Corps of Engineers ("Corps")] regulatory personnel, public affairs officers, and legal counsel that 'discusses guidelines regarding presenting the ongoing enforcement investigation to the press'" was protected by the attorney-client privilege.  722 F. Supp. 2d 66, 73 (D.D.C. 2010) (quoting related *Vaughn* Index).  The Corps argued that the email "includes regulatory personnel reiterations and characterizations of legal advice from [Corps] legal counsel."  *Id.* (quoting related *Vaughn* Index).  This Court held that this statement did not demonstrate that "the purported 'legal advice' was conveyed 'as part of a professional relationship in order to provide [the Corps] with advice on the legal ramifications of its actions.'"  *Id.* (quoting *Mead Data Cent.*, 566 F.2d at 253) (alteration in original).  Thus, the Court found that the Corps had not met its burden to show the

attorney-client privilege applied to the email, "which, after all, discusses the presentation of information to the press." *Id.*

Similarly, DOL has not met its burden here to show how advice regarding the Wagner Memorandum—a press release—was "legal advice." DOL merely states: "Information contained within the material also involves a compilation of discussions between [the Solicitor] and MSHA and advice sought by the agency-client from the Solicitor of Labor while preparing a response to Massey's allegations." *See, e.g.*, Defs. Ex. G at 000031-32, 000042, 000043-77. Indeed, this statement is even more insufficient than that rejected in *Chesapeake Bay Foundation* because DOL does not even make the conclusory assertion that MSHA sought "legal" advice. Accordingly, as in *Chesapeake Bay Foundation*, the Court should find that the attorney-client privilege does not apply to non-legal advice about a press release and order the documents pertaining to the Wagner Memorandum disclosed. *See also, e.g.*, *In re: Bisphenol-A (BPA) Polycarbonate Plastics Prods. Liab. Litig.*, No. 08-1967-MD-W-ODS, 2011 WL 1136440, at *3 (W.D. Mo. Mar. 25, 2011) ("Advice on [public relations] is not privileged, even if the advice comes from an attorney."); *United States v. Philip Morris USA, Inc.*, No. 99-2496(GK), 2004 WL 5355972, at *9 (D.D.C. Feb. 23, 2004) (holding that the attorney-client privilege "applies to communications between counsel and client made for the purpose of obtaining legal advice, and not opinions concerning . . . public relations"); *Burton v. R.J. Reynolds Tobacco Co.*, 200 F.R.D. 661, 672 (D. Kan. 2001) ("While [company's] lawyers were active participants in the ongoing public relations battle, such participation does not render all public relations issues 'legal' ones."); *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) ("It may be that the modern client comes to court as prepared to massage the media as to persuade the judge; but nothing in the client's communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status." (footnote omitted)); *City of Springfield v. Rexnord Corp.*, 196 F.R.D. 7, 9 (D. Mass. 2000) (holding that documents prepared to respond to media inquires not

privileged); *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481, 488 (D. Kan. 1997) ("A party may not cloak a document with a privilege by simply having . . . public relations matters handled by attorneys, whether in-house or outside counsel.").

ii.      *DOL Waived the Attorney-Client Privilege through Deliberate Disclosure to the Media.*

DOL's deliberate and coordinated efforts to ensure the broad dissemination of both draft and final copies of the Wagner Memorandum destroys any attorney-client privilege as to the Memorandum and related documents.   "[I]t is axiomatic that the voluntary disclosure of an otherwise privileged communication generally vitiates the privilege." *In re Veiga*, 746 F. Supp. 2d 27, 34 (D.D.C. 2010) (citation omitted); *see also Coastal States Gas*, 617 F.2d at 863. Significantly, voluntary disclosure of the attorney-client communication to a third-party waives the attorney-client privilege not only as to that specific communication, but also for all other communications related to the same subject matter.  *In re Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994).

In *E.I. DuPont De Nemours & Co. v. Kolon Industries*, for example, DuPont asserted the attorney-client privilege over emails related to its press release trumpeting an FBI investigation into a competitor's alleged efforts to steal its intellectual property.  269 F.R.D. 600, 604 (E.D. Va. 2010). The defendant competitor sought access to the emails to defend itself in a civil suit filed by DuPont. *Id.*  The court held that the attorney-client privilege did not protect "any communications (in DuPont's possession) . . . containing factual information [responsive to the request] . . . because DuPont chose to broadcast the substance of those communications to the public."  *Id.* at 607.

Here, DOL is similarly attempting to withhold hundreds of emails and related documents under the attorney-client privilege.   But it too has "broadcast the substance of those communications" to the public by leaking the Wagner Memorandum to the AP and other news outlets.  *Id.*  That information thus "cannot be shielded now" because "'[a] party can't selectively cho[o]se which portions of a document to release to the public and which portions it wishes to

assert [the attorney-client] privilege.'" *Id.* (quoting *Krenning v. Hunter Health Clinic, Inc.*, 166 F.R.D. 33, 35 (D. Kan. 1996) (some alterations in original)).  Rather, "<u>public</u> disclosure of information, particularly when the disclosing party voluntarily broadcasts the information in media channels . . . destroys any expectation of privacy." *DuPont*, 269 F.R.D. at 605 (emphasis in original) (citation omitted); *see also Coastal States Gas*, 617 F.2d at 863 (holding that the "fundamental prerequisite to assertion of the [attorney-client] privilege" is "confidentiality both at the time of the communication" and afterward).

The evidence is overwhelming that DOL disclosed drafts and final versions of the Wagner Memorandum to the press.  SUMF ¶¶ 43-47.  Thus, the subject-matter waiver affected by DOL's public relations campaign mandates disclosure of all withheld documents.

<em>iii.</em>     <em>DOL's Belated Claim that a "Memo Is Not a Memo" Is Disingenuous.</em>

In an attempt to muddy the Court's analysis of these issues and obscure its deliberate public relations campaign, DOL boldly claims for the first time in its brief that it provided the press with a "conglomeration of numerous deliberative discussions, confidential meetings, different drafts and re-drafts of memorandums and many versions of numerous documents" rather than a "memo." Defs. Br. at 27.

This claim that the disclosed memo is not a memo is disingenuous at best, and belied by the evidence.  *First*, a common sense reading of the text disclosed by senior advisor Fillichio to AP reporter Hananel contains the hallmarks of an official memorandum.  The text disclosed contains questions presented, section headings, and a cogently argued analysis of the issues.  SUMF Ex. 15. The document is a focused inquiry and does not resemble a "conglomeration" of thoughts, discussions, and separate drafts.  *Second*, among the few emails produced by DOL are a series of exchanges that expressly reference a memorandum and <u>even contain document attachments</u>.  SUMF Ex. 16.  *Finally*, correspondence between DOL staff and news reporters are riddled with repeated

references to the "memo" or "memorandum."  Three emails between Mr. Fillichio and Mr. Hananel reference a "memo."  SUMF Exs. 14-15.  Indeed, Mr. Fillichio's July 21, 2010 email to Mr. Hananel contains the subject line: "final memo language."  SUMF Ex. 15.  Further, five emails between journalist Sharpe and DOL public relations specialist Louviere also refer repeatedly to the "memo" disclosed to the AP.  SUMF Exs. 19-20.

The Court should not be distracted by DOL's self-serving misrepresentation.  The evidence shows DOL developed a memorandum with an eye towards its public release and then executed its public relations strategy.  Because DOL's own documents refute its disingenuous assertion of the attorney-client privilege, Performance is entitled to summary judgment and the disclosure of the withheld documents.  *See In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) (holding that disclosure waives the privilege).

### B.      DOL Cannot Withhold the Requested Information under the Work-Product Privilege.

DOL's actions also prevent it from claiming the work-product privilege.  Because DOL created the Wagner Memorandum for the purpose of wide dissemination via the press, the Memorandum and related documents are not covered by the work-product privilege.  Further, even if the privilege applied, DOL waived it by leaking the Wagner Memorandum to the press.

#### i.      *The Work-Product Privilege Does Not Apply.*

The work-product privilege protects material "that [is] prepared in anticipation of litigation or for trial."  *Veiga*, 746 F. Supp. 2d at 34 (quoting Fed. R. Civ. P. 26(b)(3)(A)).  To demonstrate its application, DOL must establish that the "document can fairly be said to have been prepared or obtained <u>because of</u> the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (emphasis added) (citation omitted).  Both the text of the Wagner Memorandum and DOL's already released emails, however, establish that the explicit purpose of the document was to

respond publicly to Massey Energy Co.'s statements concerning ventilation at the Mine.[3]  SUMF Exs. 14-20.  As noted above, even DOL has conceded this with its admission that "the records and information [sought to be withheld] under[lay] the development of the document provided to the press." Plick Decl. ¶ 21.  This admission alone should end the analysis.

DOL cannot assert the work-product privilege for a document that essentially was a press release.  "[A] press release, by its very nature, is meant for the public eye and is not privileged." *Freeport-McMoran Sulphur, LLC v. Mike Mullen Energy Equip. Res., Inc.*, No. 03-1496, 2004 WL 1299042, at *8 (E.D. La. June 4, 2004) (citations omitted); *see also Calvin Klein Trademark Trust*, 124 F. Supp. 2d at 210 (finding that a draft press release sent to counsel was not protected work product). For example, in *In re Chevron Corp.*, the district court allowed the deposition of a lawyer because, "matters conveyed to the attorney for the purpose of having the attorney fulfill the . . . [public relations] role do not become privileged by virtue of the fact that the lobbyist has a law degree or may under other circumstances give legal advice to the client, including advice on matters that may also be the subject of . . . [other non-legal] efforts."  749 F. Supp. 2d 141, 166 (S.D.N.Y. 2010) (footnote omitted).  The fact that some of DOL's press-release advisers here may have had law degrees similarly does not shield their efforts from disclosure.

Because the Wagner Memorandum was created in anticipation of its release to the press rather than in anticipation of ligation, neither the Memorandum nor any related documents are protected by the work-product privilege.  *See Dupont*, 269 F.R.D. at 605.

       *ii.*       *DOL Waived the Work-Product Privilege.*

If the attorney work-product privilege ever applied, DOL waived the privilege by disclosing the Wagner Memorandum to the press because the "disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary." *United States v.*

---

[3] Massey Energy Co. was Performance's parent corporation at the time.

*Thompson*, 562 F.3d 387, 394 (D.C. Cir. 2009) (internal quotation marks omitted); *see also Deloitte*, 610 F.3d at 140 (holding the work-product privilege waived where information voluntarily disclosed because disclosure "is inconsistent with the maintenance of secrecy from the disclosing party's adversary"). In determining whether a party waived the work-product privilege, the Court considers whether: (1) "the party had no reasonable basis for believing that the disclosed materials would be kept confidential by the [government]"; (2) "the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege"; and (3) "waiver of the privilege in these circumstances would not trench on any policy elements now inherent in this privilege." *Id.* (quotation marks omitted) (alteration in original). Just as with the attorney-client privilege, the waiver generally is broad and subject-matter based. The purposeful disclosure of allegedly protected information to the media vitiates the work-product privilege for both the released information and "all other communications relating to the same subject matter." *Dupont*, 269 F.R.D. at 605 (citation omitted).

DOL did not have a reasonable basis for believing that the press would keep the Wagner Memorandum confidential. DOL purposely released the Memorandum to the AP—a global news organization whose <u>sole goal</u> is to provide news and information to "more than half of the world's population" each day.[4] DOL also provided the Wagner Memorandum to a CBS affiliate, *Sharpe's Point*, and *The Charleston Gazette*. SUMF ¶¶ 46-47. Having provided the Wagner Memorandum to all these news organizations, DOL cannot credibly assert that it reasonably believed that the Wagner Memorandum would remain confidential. *Cf. Dupont*, 269 F.R.D. at 605.

Moreover, DOL's claim of work-product privilege after selectively disclosing information to the press is flatly inconsistent with the privilege's purpose. DOL is violating a central tenant of the

---

[4] *See About AP: Facts and Figures*, available at http://www.ap.org/pages/about/about.html.

work-product privilege in attempting to use the privilege "as a tool for [the] manipulation" of what information can be selectively protected or released. *Sealed Case*, 676 F.2d at 807.[5]

Because DOL intentionally publicized both draft and final copies of the Wagner Memorandum to the press, it has waived any work-product privilege that may have existed. The waiver affects the Wagner Memorandum itself, as well as all documents pertaining to the any subject matter discussed therein. *See Dupont*, 269 F.R.D. at 605. The Court thus should grant Performance summary judgment and order the withheld documents disclosed.

### C.     The Deliberative-Process Privilege Offers DOL No Shelter.

Incredibly, DOL asserts that the deliberative-process privilege also shields the withheld documents because they are all: (1) predecisional; and (2) deliberative. *Petroleum Info.*, 976 F.2d at 1434. A document is "predecisional" if it is "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Id.* (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)). Documents that "reflect[] the give-and-take of the consultative process" are deliberative. *Id.* (citation omitted). Courts also examine whether release of the requested documents would harm "candid discussion" within the agency as another indicator that a document is deliberative in nature. *Id.*

DOL cannot withhold the Wagner Memorandum under the deliberative-process privilege

---

[5] The constraints placed on prosecutorial conduct and grand jury practice are instructive to the analysis of why a finding of waiver here would vindicate, not vitiate, the policies animating the work-product privilege. The D.C. Circuit has long held that, when a party's "tactics . . . degenerate into 'sharp practices' inimical to a healthy adversary system," the party is deemed to have waived the work-product privilege. *Sealed Case*, 676 F.2d at 818; *see also Thompson*, 562 F.3d at 394. Moreover, this Circuit has long warned those performing prosecutorial roles not to discuss with the press any matters that could come before a grand jury. *In re Sealed Case*, 192 F.3d 995, 1002-03 (D.C. Cir. 1999). Here, DOL is attempting to game the system and flout the open government mandates of FOIA by claiming privilege over information it is not afraid to wave about in the press for its own advantage. *Cf. Sealed Case*, 676 F.2d at 807 ("He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." (quoting J. Wigmore, EVIDENCE IN TRIALS AT COMMON LAW § 2327 (J. McNaughton rev. 1961))). The work-product privilege is not meant to countenance such gamesmanship. *See Sealed Case*, 676 F.2d at 818.

because it has not provided sufficient information to establish the privilege's existence, it has waived the privilege if it ever existed, and it has not produced all reasonably segregable information.

> i. *The Plick Declaration and Attached Vaughn Index Do Not Establish that the Deliberative-Process Privilege Applies.*

DOL has not justified its claim of the deliberative-process privilege by detailing: (1) the agency's normal decision-making process; (2) what role each person plays; (3) the manner in which the agency memorializes decisions; and (4) a concrete statement of the potential harms release of the requested documents would cause. *See SafeCard Servs. v. SEC*, 926 F.2d 1197, 1204 (D.C. Cir. 1991); *Mead Data Cent.*, 566 F.2d at 258.

"Crucial to the [Court's] decision [whether to sustain the deliberative-process privilege] . . . is an understanding of the function of the documents in issue in the context of the administrative process which generated them." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975). "The [agency] needs to explain such matters as how decisions like those in issue are reached; the role that staff discussion and memoranda play in such decisions; the manner in which such decisions are memorialized and explained . . . ." *Safe Card Servs.*, 926 F.2d at 1204. Mr. Plick's paltry declaration and the related *Vaughn* Index, however, do not describe the relevant DOL decision-making process, the identity and role of persons generally involved, or any meaningful description of how the claimed type of agency decision is usually made. Nor does it illuminate what conceivable agency decision-making—as opposed to public relations strategy—was implicated by crafting a press release memorandum for public disclosure.

Moreover, Mr. Plick's conclusory allegations that the release of the withheld information merely "<u>could</u> have a chilling effect on open, frank communications[]" is speculative and insufficient as a matter of law. Plick Decl. ¶ 32 (emphasis added). Conclusory statements that "any disclosure of the information withheld would impair the deliberative process . . . by inhibiting full and frank exchange of views necessary with respect to such matters" are not enough to establish the

deliberative process privilege. *Army Times Publ'g Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993) (quoting Air Force affidavit). Mr. Plick is DOL's only declarant on deliberative process matters and his affidavit is inadequate because it merely "[p]arrot[s] the case law" without any elaboration. *See id.*; *Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 831 (D.C. Cir. 1979) ("Barren assertions that an exempting statute has been met cannot suffice to establish that fact."); *Animal Legal Def. Fund, Inc. v. Dep't of the Air Force*, 44 F. Supp. 2d 295, 300 (D.D.C. 1999) (finding that "conclusory assertion[s] . . . coupled with the [agency's] failure to describe any of the documents and explain how they factored into the deliberative process" preclude granting summary judgment).

The *Vaughn* Index is similarly deficient. Rather than setting forth the required details about the agency's decision-making process, this *Vaughn* Index generally focuses on informing the Court that the documents are not memoranda but rather "compilation[s] of discussions" that were "prepared in contemplation of litigation." *See, e.g.*, Defs. Ex. G at 1-4.

DOL thus has utterly failed to meet its significant burden to justify application of the deliberative-process privilege. The Court should grant summary judgment to Performance and order DOL to release the withheld documents.

ii.      *DOL Waived the Deliberative-Process Privilege.*

DOL waived the deliberative-process privilege by violating and undermining every rationale for the privilege. The Supreme Court explained that the principal purpose of the deliberative-process privilege is to prevent internal agency discussions from becoming "front page news." *Klamath Water Users*, 532 U.S. at 9. The privilege also is meant to help agencies develop a consistent position before revealing it publicly, thereby helping to prevent public confusion. *Id.*; *Coastal States Gas*, 998 F.2d at 866. Contrary to these policy rationales, DOL deliberately made its internal communications—both draft and final versions—into, literally, front page news. If DOL was

15

willing to allow a news wire service that boasts of reaching half the world's population to see a draft copy of a non-final agency memorandum, it cannot now credibly claim that release of allegedly predecisional documents will harm the agency's deliberative process or cause public confusion.

Having leaked the information that it now seeks to claim as privileged, DOL undermines every purpose underlying the deliberative-process privilege. DOL thus has waived the privilege, and the Court should grant summary judgment to Performance accordingly.[6] *See Army Times Publ'g*, 998 F.2d at 1071 (holding that the partial release of information subject to the deliberative-process privilege demonstrates that blanket application of the privilege is unavailable).

## II.   MSHA DOES NOT DEMONSTRATE THE HARM REQUIRED TO WITHHOLD DOCUMENTS UNDER EXEMPTION 7(A).

Asserting Exemption 7(A), MSHA withheld: (i) documents related to the previous methane outbursts at the Mine on July 3, 2003 and February 18, 2004 ("03/04 Methane Outburst Request"); (ii) documents related to an interview with MSHA District 4 Manager Robert Hardman ("Hardman Transcripts Request"); and (iii) a single document related to the Mine Plan Approval System ("MPAS Request"). SUMF ¶¶ 23, 28-29, 33, 59. MSHA must be ordered to produce the withheld documents because it fails to satisfy its "exacting" burden to articulate any meaningful and specific harm that release of the requested information would cause.[7]

---

[6] Summary judgment is further warranted because DOL has failed to make any effort to identify whether documents withheld pursuant to the Wagner Memorandum Request contain information that can be segregated from portions allegedly protected by the deliberative-process privilege. Unlike the work-product privilege, the deliberative-process privilege does not protect entire documents. *Coastal States Gas*, 617 F.2d at 867. DOL expressly declined to address segregability at all because it is banking on the application of the attorney work-product exemption, which does not require any segregability analysis. Defs. Br. at 10. However, since DOL cannot establish the work-product privilege or has waived it, the Court must deny DOL summary judgment on the deliberative-process privilege grounds because the agency has failed to make any showing regarding segregability. *See Perry-Torres v. Dep't of State*, 404 F. Supp. 2d 140, 144-45 (D.D.C. 2005) (Leon, J.) (denying government's motion for summary judgment when government has failed to conduct a detailed segregation analysis).

[7] MSHA incorrectly asserts that Exemption 7(A) is to be interpreted broadly. *See* Defs. Br. at 15. As

To properly withhold documents under Exemption 7(A), the burden is on MSHA to demonstrate: (1) it compiled the withheld records for law enforcement purposes; <u>and</u> (2) release of the information could harm the investigation.[8] *Sussman v. United States Marshals Serv.*, 494 F.3d 1106, 1113 (D.C. Cir. 2007). "[I]t is not sufficient for an agency merely to state that disclosure would reveal the focus of an investigation; it must rather demonstrate <u>how</u> disclosure will reveal that focus." *Id.* at 1114 (emphasis in original) (citation omitted). Harm requires specific, factual information "about the impact of the disclosures," not conclusory statements based on generalities. *Id.*

Importantly, because MSHA's primary purpose is not law enforcement, this Court must "scrutinize with some skepticism" the agency's arguments for withholding documents under Exemption 7(A). *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982). Mixed function agencies, like MSHA, must meet an "exacting" standard when it comes to the threshold requirements of Exemption 7(A). *Id.* ("If courts accept a mixed-function agency's claims . . . without thoughtful consideration, the excessive withholding of agency records which Congress denounced and sought to avoid . . . might well result."). MSHA's affidavits here fall far short of this exacting standard.

---

the Supreme Court has noted, however, Exemption 7 "underwent a major revision" because Congress disagreed with "a sweeping interpretation given the Exemption by some courts permitt[ing] the unlimited withholding of files merely by classifying them as investigatory files compiled for law enforcement purposes." *FBI v. Abramson*, 465 U.S. 615, 621-22 (1982). Congress thus has legislated exactly the opposite of MSHA's representation to this Court: Exemption 7 is to be interpreted <u>narrowly</u>. *Coastal States Gas*, 617 F.2d at 870 (noting this is especially so after Congress "sharply narrowed" the exemption because of its unhappiness with prior court holdings giving Exemption 7 an expansive interpretation).

[8] Contrary to MSHA's assertion in its brief, Defs. Br. at 15, Exemption 7(A) is not a special category that relieves the government of its heavy burden to prove that this narrow exemption applies. *See Maydak v. Dep't of Justice*, 218 F.3d 760, 766 (D.C. Cir. 2000) ("Nothing in the statute, either express or implied, suggests that Exemption 7(A) should be singled out for preferential treatment by the courts."). This is especially the case here because MSHA is a mixed-function agency. *See Pratt*, 673 F.2d at 418.

A.     **MSHA Fails to Explain How the Release of Already Public Eight-Year-Old Investigation Results Will Harm the Current Investigation.**

MSHA's conclusory allegations simply do not satisfy its exacting burden to demonstrate how releasing further information about the methane outbursts at the Mine on July 3, 2003 and February 18, 2004—information over eight years old and that is already largely public—will harm its present investigation.

MSHA attempts to meet its burden through a single conclusory paragraph in the declaration of Norman Page, MSHA's lead investigator of the Accident:

> The harm that would result from disclosure of these documents is that their disclosure would reveal names of potential MSHA witnesses and their relevant evidence pertaining to the mine incidents.  It would also reveal findings by MSHA with respect to these earlier methane outburst incidents and the evidence that MSHA obtained in the prior investigations in 2003 and 2004.  This evidence may directly bear on MSHA's determination of the cause of the 2010 mine disaster and will be directly relevant to enforcement activities that MSHA may take with respect to the 2010 disaster.

Declaration of Norman Page ("Page Decl.") ¶ 6.[9]   MSHA's exacting burden requires far more specifics regarding potential harm than this perfunctory statement that it does not want to release (a) witness names, or (b) information that "<u>may</u>" be relevant to unspecified investigatory activities.

i.     *MSHA Cannot Credibly Claim that Release of Witness Names Will Harm the Investigation.*

MSHA withholds the entirety of hundreds of pages of documents responsive to the 03/04 Methane Outburst Request because it would allow the disclosure of specific witness names, resulting in non-specific harm to potential regulatory enforcement activities.  *Id.*  However, this justification is implausible because the agency has already released many witness names, and, even if the risk of

---

[9] Mr. Page's credibility as an impartial declarant is seriously in doubt.  Mr. Page issued baseless citations against Performance's privately retained mine experts that were summarily vacated by the DOL Solicitor's Office.  SUMF Ex. 26 at 3-4.  In retaliation for obtaining this successful vacatur, Mr. Page threatened and intimidated Performance personnel, including respected mine safety expert Dr. Christopher Schemel.  *Id.* at 4-5.  Although it declined to take any adverse action, the DOL Solicitor admitted these alleged events and that Page's conduct was "inappropriate."  *Id.* at 7.

harm was plausible, the withholding of entire documents is improper because MSHA can redact specific names under Exemption 7(C).

MSHA cannot credibly argue that harm may result from revealing the names of potential witnesses involved in an investigation into events that occurred more than eight years ago, when it has released the identity of more than two dozen witnesses' names from the current investigation, SUMF ¶ 59, and even has broadcast the availability of these witnesses' interview transcripts, SUMF Ex. 10. In light of this purposeful and highly public disclosure of these witnesses' names, MSHA's failure to explain its claims of potential harm is fatal to its assertion of Exemption 7(A). *See Petroleum Info.*, 976 F.2d at 1433 (noting that, where an agency fails to meet its burden, "summary judgment in favor of the FOIA plaintiff is appropriate" (citation omitted)).

Further, MSHA cannot use the meat cleaver of Exemption 7(A) when it can use the scalpel of Exemption 7(C). Exemption 7(C) allows MSHA to withhold witness names. *See* 5 U.S.C. § 552(b)(7)(C); *Safe Card Servs.*, 926 F.2d at 1206; Page Decl. ¶ 5. MSHA has withheld numerous documents responsive to the 03/04 Methane Outburst request in their entirety, however, in direct contravention of FOIA's command that: "Any reasonably segregable portion of a record <u>shall be provided</u> to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b) (emphasis added); *see also Stolt-Nielsen Transp. Group LTD v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (remanding case for further segregation analysis because the agency's "conclusion on a matter of law is not sufficient support for a court to conclude that the self-serving conclusion is the correct one"); *cf. Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007) (holding that "a district court clearly errs when it approves the government's withholding of information under FOIA without making an express finding of segregability" (citation omitted)).

Because MSHA can redact witness names under Exemption 7(C), MSHA has not sustained its burden of demonstrating how the disclosure of names in 03/04 Methane Outburst documents

would cause harm to its present investigation.  Performance thus is entitled to summary judgment.

    ii.  *MSHA Cannot Demonstrate Harm Because It Has Already Released the Substance of the 03/04 Methane Outburst Documents.*

  MSHA's claim that releasing the requested information would impermissibly reveal its findings regarding the 03/04 methane outbursts is also insufficient.  What matters is not whether the withheld information is relevant, but whether it will harm the investigation if released.  *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989) (citation omitted) (holding that Exemption 7(A) requires agency to show that disclosure would "interfere" with an enforcement proceeding rather than merely stating that the information "relates" to the proceeding); *Sussman*, 494 F.3d at 1114. This Court has already rejected MSHA's nearly identical claims of non-specific and speculative harm in *UtahAmerican Energy v. Dep't of Labor.*  700 F. Supp. 2d 99, 108-09 (D.D.C. 2010) (Leon, J.). "Exemption 7(A) requires 'predictive judgment' of future harm which can '<u>reasonably</u> be expected.'" *Id.* at 109 (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003) (emphasis in original)).

  Harm simply cannot reasonably be expected from the release of documents related to the 03/04 methane outbursts when the substance of MSHA's findings have been released to third parties or the public on at least three occasions.

  *First*, on May 19, 2011, the West Virginia Governor's Independent Investigation Panel released the document commonly referred to as the "McAteer Report," regarding the Panel's investigation into the Accident.  This Report not only cites three MSHA's reports regarding the 03/04 methane outbursts, but also contains an extensive discussion of those findings.  SUMF Ex. 9 at 69-73.  MSHA thus already has disclosed the very details of its investigation into the 03/04 methane outbursts that it now seeks to withhold.

  *Second*, MSHA released to the press a memorandum dated March 4, 2004, which similarly includes the agency's findings for the 03/04 methane outbursts.  This memorandum details MSHA's

investigation into the 03/04 methane outbursts, potential causes of the two methane outbursts, its conclusions regarding the events, and its evaluation of Performance's proposed response thereto. SUMF Ex. 7 at 2-6.

*Third*, documents produced by MSHA in partial response to the 03/04 Methane Outburst Request confirm that MSHA previously disclosed the very subject matter it now attempts to withhold. Specifically, an MSHA memorandum dated July 15, 2004, contains the agency's conclusions regarding the source of the outbursts, as well as its observations about future mine operation. SUMF Ex. 8 at 2-4. This prior memorandum expressly recounts a meeting and states that MSHA officials "share[d] information with Performance Coal Company personnel pertaining to floor methane outbursts." *Id.* at 1. This disclosure of information (now withheld) is consistent with the agency's mandate. Had MSHA kept critical findings hidden from public view, the agency would have egregiously violated its mandate to act in the interest of miner safety. *See* 30 U.S.C. § 801(a).

Given its extensive disclosure of its findings regarding the 03/04 methane outbursts, MSHA's claims of harm do not justify its withholding related documents under Exemption 7(A). The Court must reject MSHA's claims here as it did in *UtahAmerican Energy*, where DOL and MSHA submitted affidavits warning that release of complete interview transcripts would "undermine" their investigation. 700 F. Supp. 2d at 107. Similar to its current arguments, the agencies there asserted that release of the information would "reveal names of potential MSHA witnesses" and identify "the nature of the evidence that may be presented at trial and disclos[e] MSHA's evaluation of said evidence." *Id.* at 108 (quoting declaration submitted by government). This Court found that such "oblique references to alleged possible interference with ongoing investigations" were not sufficient to justify withholding the transcripts' release because DOL had already made fifty-nine witness names public and published a report detailing many of the investigation's conclusions. *Id.* at 108.

But MSHA employee Mr. Page makes the same "oblique references" to harm that this Court found insufficient in *UtahAmerican Energy*.  If such references were found insufficient by this Court in *UtahAmerican Energy*, they are insufficient here.  MSHA cannot now summarily assert that release of the requested information will harm its investigation when MSHA has already disclosed that information to non-MSHA personnel and allowed that information to go public.  *See UtahAmerican Energy*, 700 F. Supp. 2d at 108 (refusing to find harm sufficient where agency "fail[ed] to explain with greater particularity" how information summarized in public report "could compromise [the] ongoing investigations").

The Court therefore should grant Performance summary judgment and order the release of documents withheld under Exemption 7(A) responsive to the 03/04 Methane Outburst Request.

**B.       Disclosure of the Hardman Transcripts Would Not Harm the Investigation.**

District 4 Manager Robert Hardman was the MSHA employee in charge of the Mine in the immediate wake of the Accident.  SUMF ¶ 53.  Thus, as part of its Accident investigation, MSHA investigators interviewed Mr. Hardman.  *See* Page Decl. ¶ 7.  MSHA has wrongfully withheld the transcripts of this interview ("Hardman Transcripts") under Exemption 7(A).  The Declaration of Norman Page states only non-specific conclusory allegations of potential harm that are woefully inadequate.  MSHA's refusal to release the Hardman Transcripts is further undermined by its prior release of the requested information and dozens of related interview transcripts, which affects a waiver of any right to claim Exemption 7(A).  The Page Declaration further fails to state whether the agency performed an adequate segregation analysis.

i.       <em>MSHA Does Not Demonstrate Any Concrete Harm.</em>

MSHA cannot justify withholding the Hardman Transcripts in their entirety when: (a) it has already disclosed those transcripts to the press and to the McAteer team; and (b) it has released dozens of similar transcripts in full.

22

On September 15, 2010, an article appeared in *The Charleston Gazette* discussing the Hardman Transcripts.   SUMF Ex. 22.   The reporter, Mr. Ward wrote: "[I]n an interview with investigators, MSHA's Bob Hardman said that at 12:22 a.m.—12 minutes after that news release—agency officials were still trying to get an accurate count."   *Id.*   After this news report, Performance submitted a FOIA request, specifically referencing Mr. Ward's article, and asking for a copy of the transcript that was leaked to the press.   Am. Compl. Ex. T.   Here, MSHA identifies these transcripts as: "[T]hree interview transcripts of Robert Hardman, MSHA District Manager, Coal Mine Safety & Health District 4, taken by MSHA's accident investigation team on May 27, 2010, June 4, 2010, and June 6, 2010."   Page Decl. ¶ 7.

MSHA has also provided the Hardman Transcripts to the team writing the McAteer Report. *See* SUMF Ex. 9 at 39, 84.   Indeed, the McAteer Report quotes extensively from the withheld transcripts.   *See, e.g., id.* at 36 (quoting June 6, 2010 Tr.); *id.* at 78 (quoting May 27, 2010 Tr.).

Having already leaked the Hardman Transcripts to the press and the McAteer team, MSHA cannot credibly demonstrate the propriety of withholding those same documents under Exemption 7(A), as any assertion of harm is wholly without basis.   *See UtahAmerican Energy*, 700 F. Supp. 2d at 108 (holding that DOL's failure to explain harm of full transcript release "with greater particularity . . . should not be rewarded by this Court").   Indeed, MSHA has not even attempted to explain how release of the requested information will harm its investigation when it has allowed the press and Mr. McAteer to quote from those same transcripts and to discuss his testimony in depth.

Mr. Page's claim that Mr. Hardman is such a key witness that the release of his interview transcripts would allow for witness collusion is specious, at best.   *See* Page Decl. ¶ 8.   MSHA has already released this exact information to the press and the McAteer team.   Any witness who desires this information need not file a FOIA request; he or she need only consult Mr. Ward's news article or the McAteer Report—both of which are conveniently available to the world online.   *See* SUMF

Ex. 9 at 33-34, 36, 39, 76, 78, 84; SUMF ¶ 53.  This Court has already rejected a nearly identical

arguments in *UtahAmerican Energy*, ruling that witness collusion and intimidation arguments are not

credible threats of harm to the investigation because similar information was previously publicly

released in an investigative report.  700 F. Supp. 2d at 109.

In addition, MSHA's allegations of harm are even further undercut by the fact that it

released twenty-five other accident investigation witness interview transcripts.  SUMF ¶ 59.  These

transcripts were released on the very same day that MSHA filed Mr. Page's declaration with this

Court, stating: "The release of such a key interview transcript at this time may have a chilling effect

on other witnesses who wish to provide voluntary interviews to MSHA but do not wish their

information to be released to the public."  Page Decl. ¶ 8.

Moreover, these twenty-five other transcripts of testimony from Performance, MSHA, and

the West Virginia state mining agency employees cover "mine rescue and recovery activities

immediately following the blast," as well as other "additional information."  *See* SUMF Ex. 10.

These are some of the same topics covered in the Hardman Transcripts.  Page Decl. ¶ 7 (noting that

the Hardman Transcripts include numerous "statements address[ing] MSHA's immediate response

upon notification of the accident at the Upper Big Branch mine").

MSHA's filings in this case fail to even acknowledge the public release of these twenty-five

related transcripts, much less justify the different treatment accorded Mr. Hardman's transcripts.

MSHA thus fails to demonstrate harm and the Court should order disclosure of the documents.  *See*

*UtahAmerican Energy*, 700 F. Supp. 2d at 109.

ii.      *MSHA Waived the Protections of Exemption 7(A).*

MSHA waived its ability to withhold the Hardman Transcripts under Exemption 7(A) by

providing those transcripts to the press and Mr. McAteer.  As the D.C. Circuit held in *Cottone v. Reno*,

"materials normally immunized from disclosure under FOIA lose their protective cloak once

disclosed and preserved in a permanent public record." 193 F.3d 550, 554 (D.C. Cir. 1999). In that case, the government sought to withhold tape recordings that it had played in court. *Id.* at 552-53. When a FOIA requester sought the tapes, however, the government withheld them under Exemption 7(A). *Id.* at 553. The D.C. Circuit held that, because the requester could specifically identify the tapes and they had entered the public domain when played in court, the tapes must be disclosed. *Id.* at 555.

Here, MSHA has already specifically identified the Hardman Transcripts, Page Decl. ¶ 7, and they are in the public domain, having been disclosed to the press and quoted liberally in the McAteer Report, SUMF ¶ 53; SUMF Ex. 9 at 39, 84. *See Cottone*, 193 F.3d at 554 (stating that it is "clear" that tapes played at trial have entered the public domain). Thus, as in *Cottone*, MSHA has waived its ability to withhold the Hardman Transcripts under Exemption 7(A).

> ### iii.    *MSHA Did Not Segregate All Releasable Information.*

MSHA's failure to explain whether it analyzed the Hardman Transcripts for segregable information is yet another basic failure in its submissions to this Court. *Cf. Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008) (approving affidavit where agency stated it "had conducted a page-by-page review of all investigative records contained in the requested documents, and determined that each document, and each page of each document" was non-segregable). MSHA's failure to segregate disclosable information is reason alone for granting summary judgment to Performance. *See Morley*, 508 F.3d at 1123 (reversing district court where segregation requirement not met).

If MSHA can release full transcripts of twenty-five other people's interviews, MSHA can— at the very least—segregate and produce Mr. Hardman's testimony on the same topics. *See Army Times Publ'g*, 998 F.2d at 1071 (reversing the district court and remanding for a segregability review where "[n]othing in the index or [the government]'s affidavits suggests that the withheld information is different in any relevant respect from that which has been released voluntarily"). The Court

therefore should grant Performance summary judgment and order the release of the Hardman Transcripts.

### C.   MSHA Does Not Justify Withholding One Page from the MPAS Request Production.

MSHA cannot justify withholding one page of notes, out of thousands produced in response to the MPAS Request, with an insufficient and wholly speculative Declaration from FBI Agent James F. Lafferty ("Lafferty Declaration").

#### i.   *The MPAS Document Was Not Compiled for a Law Enforcement Purpose.*

MSHA's claim of Exemption 7(A) must be overruled and the one page produced.  To be withheld under Exemption 7(A), MSHA must demonstrate that—at the very least—the document was compiled for a law enforcement purpose.  *See Sussman*, 494 F.3d at 1114.  Agent Lafferty's Declaration fails to establish: (1) a rational nexus between the investigation and MSHA's law enforcement duties; and (2) a connection between a particular individual or incident and a potential violation of federal law.  *See Nat'l Sec. Studies*, 331 F.3d at 926.

Here, Agent Lafferty does not state that the FBI compiled the one-paged document for a law enforcement purpose.  Indeed, his exceedingly brief four paragraph declaration does nothing to describe the document in any useful detail and does not discuss whether the single page is part of any investigative files.  Lafferty Decl. ¶¶ 2-4.  This hardly meets MSHA's exacting burden as a mixed-function agency to prove that it compiled the withheld document for a law enforcement purpose.  *See Pratt*, 673 F.2d at 418.  Because Agent Lafferty's declaration fails to meet even this basic requirement, the Court should order the document's immediate release.

#### ii.   *MSHA Does Not Distinguish This One Page from the Thousands of Pages It Has Released.*

MSHA's conclusory allegations also fail to substantiate how the release of a single page responsive to the MPAS Request harms its investigation when it already has released thousands.

In *Army Times Publishing*, the government sought to withhold the full results of a poll it had completed of members of the armed forces despite the fact that it had released select poll results that were favorable.  998 F.2d at 1069.  The D.C. Circuit held that the agency must "offer some distinguishing feature of the withheld information" in order to sustain its burden under FOIA to demonstrate that the withheld information is exempt from disclosure.  *Id.* at 1071-72.

Here, however, MSHA does not explain why this single page is so substantially different from the thousands it has already produced.  Agent Lafferty does no more than state that it is a single page of "notes pertaining to ventilation at UBB."  Lafferty Decl. ¶ 2.  Although MSHA has the burden of explaining why this one page of information that "could" reveal "potential testimony" must be withheld, *id.* ¶ 4, when thousands of pages of information are available for all to see, Agent Lafferty's Declaration provides no clue.  *See Petroleum Info Corp.*, 976 F.2d at 1433 (holding that "the burden is on the agency" to show that the Exemption 7(A) applies (internal quotation marks and citation omitted)).

           iii.       *Conclusory Allegations Are Not Enough.*

MSHA cannot merely allege that releasing the withheld document will allow witness collusion.  Rather, it must provide enough information to allow a court to make "a predictive judgment of future harm which can <u>reasonably be expected</u>."  *Utah American Energy*, 700 F. Supp. 2d at 109 (emphasis in original) (internal quotation marks and citation omitted).  Yet conclusory allegations are the only support for withholding the single page of an MPAS document.  *See* Lafferty Decl. ¶ 4 (summarily stating that release could "reveal[] information about the likely scope, direction, or focus of the criminal investigation"); *id.* (summarily stating that release could "reveal[] the content of this potential testimony . . . giv[ing] important information to potential witnesses or defendants that would allow them to construct false testimony").

MSHA thus has not met its burden for withholding the single page responsive to the MPAS Request, and the Court should order that document released.   At the very least, Performance respectfully asks this Court to exercise its discretion to examine the document *in camera* to determine if it differs substantially enough from the information MSHA has already released such that withholding under Exemption 7(A) is proper.   *See* 5 U.S.C. § 552(a)(4)(B) (allowing *in camera* review).

## III.   MSHA DOES NOT JUSTIFY WITHOLDING INSPECTORS' NAMES UNDER EXEMPTION 7(C).

MSHA also seeks to withhold the names of its inspectors under Exemption 7(C).   Defs. Br. at 20-23.   It has invoked this exemption to protect inspector names at least 498 times.   *See* Defs. Exs. A, C, D-F.   Exemption 7(C), however, only protects the release of information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy."   5 U.S.C. § 552(b)(7)(C).   Like its counterpart Exemption 7(A), Exemption 7(C) is not a broad blanket under which the government may seek to keep secret any name found in its investigatory files.   *See Stern v. FBI*, 737 F.2d 84, 94 (D.C. Cir. 1984) (requiring the government to reveal the name of an FBI employee).   Instead, the government must demonstrate that the individual's privacy interest outweighs the public's interest in disclosure of the information.   *Id.* at 91.   As MSHA itself notes, the core public interest at stake in FOIA is "shedd[ing] light on an agency's performance of its statutory duties."   Defs. Br. at 21 (citing *Reporters Comm.*, 489 U.S. at 773).   Under the unique facts of this case, this balance falls on the side of disclosure.[10]

Performance only seeks the release of the inspectors' names.   All of the inspectors are government employees, which necessarily "diminishes their privacy interests" in the protection of their identities.   *See Stern*, 737 F.2d at 92.   The inspectors' actions, along with the actions of everyone

---

[10] Because Exemption 7(C) "places a greater emphasis on protecting personal privacy than does Exemption 6, it is clear that Exemption 6 also is no bar to disclosure" of the inspectors' names. *Stern*, 737 F.2d at 91.

associated with MSHA, have become the subject of heightened public scrutiny.   The recently released McAteer Report directly calls into question the methods employed by MSHA inspectors and their diligence in performing inspections.   *See* SUMF Ex. 9 at 76-83 (harshly criticizing MSHA officials and employees for their multiple inspection failures); *id.* at 82 (stating that only "[s]ome inspectors took appropriate action" to correct violations); *id.* at 111 (faulting inspectors for not catching and alerting their supervisors to reoccurring problems and concerns in the nation's mines). Indeed, the Report itself even reveals one of the Mine inspectors' names.   *Id.* at 82 (naming Keith Stone).   If the public is to be able to make an independent judgment about what occurred in the Mine, it must know who did what when.   If the McAteer Report can name MSHA officials and even inspectors without causing calamity, MSHA has not demonstrated any harm from the further release of inspectors' names.   No intimidation of Mr. Stone or any other MSHA employee has occurred. *Cf. UtahAmerican Energy*, 700 F. Supp. 2d at 109 (finding that, when a formal report released witness names and no intimidation or other untoward actions occurred, government could not meet its burden to show harm).

        This Circuit has recognized that, when heightened public interest combines with publicly-acknowledged investigations, release of individuals' names can be required.   In *Stern*, the D.C. Circuit faced a reporter's request to reveal the name of an FBI employee who had been accused of wrongdoing related to the FBI's domestic spying activities in the 1960s and 1970s.   737 F.2d at 87-88.   An independent investigation concluded that wrongdoing had occurred.   *Id.* at 87.   The names of those involved, however, were withheld.   *Id.*   The D.C. Circuit found that the name of the FBI agent involved had to be released, as Exemption 7(C) could not protect it from disclosure.   *Id.*   at 93-94.   "The public has a great interest in being enlightened about . . . malfeasance by" government officials and employees.   *Id.* at 94.   That great public interest, as shown by the independent investigation and heightened news media interest, outweighed any privacy interest held by the

individual employee.  *Id.*

Here, there can be no question that there is "great public interest" in what occurred both before and after the tragedy at the Mine.  An independent investigation has harshly criticized both MSHA and its inspectors' performance of their duties.  *See* SUMF Ex. 9 at 76-83, 111.  That Report also has named names.  *Id.* at 82.  Press interest in what has occurred and who is to blame is equally high.  *See, e.g.,* SUMF ¶¶ 443, 46-47, 53, 60.  Any diminished privacy interest that these public employees have is outweighed by the public's far greater interest in knowing who is responsible for events at the Mine.  *See Stern*, 737 F.2d at 92 (noting this diminished interest).  Performance therefore requests that MSHA be ordered to release all inspector names withheld under Exemption 7(C).

## IV.   NEITHER MSHA NOR DOL CONDUCTED ADEQUATE SEARCHES IN RESPONSE TO PERFORMANCE'S FOIA REQUESTS.

Performance is entitled to summary judgment because Defendants have not demonstrated that they conducted adequate searches for responsive documents.  FOIA requires an agency to make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (citation and quotation marks omitted); *see also Steinberg*, 23 F.3d at 551.  Defendants' declarations must: (1) provide a detailed account of search methodology; and (2) demonstrate that methodology "was reasonably calculated to uncover all relevant documents."  *Wilderness Soc'y v. Dep't of the Interior,* 344 F. Supp. 2d 1, 20 (D.D.C. 2004) (citation omitted).

The declarations submitted in this case do neither.  Woefully lacking in detail and specificity, they simply do not provide a sufficient basis for the Court to evaluate the adequacy of the agencies' searches for responsive documents.

A.      **Defendants Do Not Sufficiently Explain the Search Methodologies Used to Locate Responsive Documents.**

None of the Defendants' declarations provide the required detail about "what records were searched, by whom, and through what process." *Steinberg,* 23 F.3d at 552; *see also Bonaparte v. United States Dept' of Justice,* 531 F. Supp. 2d 118, 122 (D.D.C. 2008) (holding agency affidavit deficient because it failed to "describe the filing systems searched, the search methods employed and the search terms utilized").   Where, as here, these minimum indicia of completeness are lacking from agency declarations, "serious doubts" arise as to the adequacy of the search and "summary judgment in the government's favor would usually be inappropriate." *Wilderness Soc'y v. Bureau of Land Mgmt.,* No. 01-2210, 2003 WL 255971, at *5 (D.D.C. Jan. 15, 2003) (citation and quotation marks omitted). Instead of providing the requisite specificity, Defendants do not provide <u>any</u> information as to how the searches were carried out or why they were thorough, simply stating instead that they conducted searches and the agencies' efforts were "thorough."

These bare conclusory assertions do not describe searches "reasonably calculated to uncover all relevant documents." *Steinberg*, 23 F.3d at 551.   Defendants' description of their search efforts are like those found insufficient in *Weisberg v. United States Dep't of Justice.*   627 F.2d 365, 370 (D.C. Cir. 1980) (*Weisberg I*).    In that case, the plaintiff submitted a FOIA request to the FBI seeking documents related to the assassination of President Kennedy.   *Id.* at 366-67.   The FBI submitted an affidavit which simply asserted that an agency official "ha[s] conducted a review of [agency] files which would contain [responsive] information." *Id.* at 370.   The D.C. Circuit determined that such a vague conclusory affidavit did not establish the adequacy of the FBI's search for responsive documents because it did not describe the approach used or the specific files searched.   *Id.* at 370-71.

Similarly, the Defendants' declarations fail to "describe the filing systems searched, the search methods employed and the search terms utilized" and therefore do not provide the court

with any "basis to determine whether the search was adequate[.]" *Bonaparte*, 531 F. Supp. 2d at 122; *see also Piper v. Dep't of Justice*, 294 F. Supp. 2d 16, 21 (D.D.C. 2003). Defendants' declarations stand in stark contrast to the agency efforts detailed in *Dorsey v. EEOC*, where the agency provided the court with the exact search terms employed: "EDD & EEOC, Carey Dorsey vs. The Surfer Restaurant and Hotel." No. 09CV519 BEN (AJB), 2010 WL 3894590, at *3 (S.D. Cal. Sept. 29, 2010). The agency also provided the court with a complete list of all documents the search terms returned along with a list of documents that no longer existed because they had been destroyed. *Id.* For the destroyed documents, the agency informed the court of when it destroyed the documents and what document retention policies justified the destruction. *Id.* This Court will search in vain to find <u>any</u> of that information here.

Neither the Lanesia Washington nor Joseph Plick's declarations provide more than bare assertions that certain offices or teams were contacted and that searches of "paper and electronic files" were conducted. *See* Declaration of Lanesia Washington ("Washington Decl.") ¶¶ 13, 36, 43; Plick Decl. ¶¶ 12, 14-15. Ms Washington's declaration, for example, says absolutely nothing about which individuals were determined to have responsive documents or what files were actually searched. *See* Washington Decl. ¶¶ 9-47. Instead, Ms. Washington's declaration contains the general statement that District 4 only possessed three file drawers of potentially relevant documents in the entire office, covering only the past five years. *Id.* at ¶ 11. Further, neither Ms. Washington nor Mr. Plick disclose any details as to the search terms used or search methods deployed to ensure an adequate search. *See id.* ¶¶ 13, 30, 43-44, 45, 36-38; Plick Decl. ¶¶ 13-15; *cf. Dorsey*, 2010 WL 3894590, at *3 (approving the agency's affidavit revealing the exact search terms used).

In one of the most extreme examples, Ms. Washington describes the search for documents responsive to the 1997 Methane Ignition Request by merely stating: "The District 4 staff conducted a search of its files in order to retrieve records responsive to this request." Washington Decl. ¶ 30.

Ms. Washington provides no further information.

Put simply, the Court does not have the information it needs to measure Defendants' searches against the accepted legal standards.  These bare assertions fall far short of showing that Defendants conducted searches "reasonably calculated to uncover all relevant documents." *Steinberg*, 23 F.3d at 551; *see also Scientology*, 610 F.3d at 834 (holding insufficient affidavits that merely "explain that searches were made by departments in which sought-after materials expectably might repose").

### B.    Defendants Improperly Narrowed Performance's FOIA Requests.

Unlike Defendants here, an agency must "construe FOIA request[s] liberally." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).  Where an agency unilaterally narrows the scope of a FOIA request, it necessarily fails to conduct an adequate search.  *See Wilderness Soc'y*, 2003 WL 255971, at *5 (concluding that agency's search was inadequate because "responsive documents [possibly maintained] in the locations searched may not have been produced as a result of the [agency's] narrow interpretation of plaintiffs' request").  Defendants—without Performance's consent—narrowed the scope of Performance's FOIA requests by failing to search certain types of records and unnecessarily limiting what records were searched.

This failure is particularly frustrating given that this Court recently chastised MSHA for its failure to construe FOIA requests appropriately.  In *UtahAmerican Energy, Inc. v. MSHA*, the plaintiff submitted a very broad request for "'[a]ny and all documents in the actual or constructive possession of MSHA,' including emails, 'which relate in any way to the Crandall Canyon Mine[.]'"  725 F. Supp. 2d 78, 80 (D.D.C. 2010) (alterations in original) (citation omitted).  Simultaneous with plaintiff's FOIA request, MSHA was responding to more narrow requests for information from Congressional committees regarding the same mine.  *Id.* at 79.  MSHA chose to respond to the plaintiff's broad FOIA request by searching the same sets of documents compiled for Congress, despite the fact that the Congressional requests were limited by both time and subject matter.  *Id.* at 82.  This Court

therefore found MSHA's search patently inadequate and denied its motion for summary judgment. *Id.* at 83. As the Court emphasized, an agency may not unilaterally narrow a FOIA request by adding date and subject matter restrictions where none are explicitly stated in the request. *Id.* Rather, every effort must be made to retrieve "all documents responsive to [the plaintiff's] request." *Id.*

MSHA's declarations here demonstrate that the agency unilaterally and impermissibly narrowed the scope of Performance's FOIA requests. For example, the 03/04 Methane Outburst Request expressly encompass "electronic correspondence" and "electronic . . . data." Am. Compl. at Ex. I n.1. Notwithstanding the clear inclusion of electronically stored data, the Washington Declaration shows that MSHA did not search its electronic files when responding to this request. Instead, Ms. Washington states that MSHA searched only District 4's "paper files" for responsive materials. Washington Decl. ¶ 24. This is patently inadequate. *See UtahAmerican Energy*, 725 F. Supp. 2d at 83-84 (scolding MSHA for its failure to conduct a proper search of email).

Furthermore, MSHA substantially and improperly narrowed the scope of several other FOIA requests by searching only District 4 headquarters and National Laboratory files for responsive documents. The Rock Dust, 03/04 Methane Outburst, and 1997 Methane Ignition Requests sought various categories of documents "prepared, reviewed, considered or received by any and all MSHA personnel including MSHA's District IV, MSHA's District IV Field Offices, MSHA's Arlington headquarters and MSHA's Pittsburgh Safety and Health Technology Center." Am. Compl. at Exs. A, I, N, and O. Yet MSHA improperly narrowed the scope of these request by failing to search all of these locations for responsive documents. *See* Washington Decl. ¶¶ 13-14, 22-24, 30. Because MSHA improperly narrowed Performance's FOIA requests, its searches for documents in response thereto were necessarily inadequate.

**C.      The Near Total Absence of Entire Categories of Documents Demonstrate the Inadequacy of Defendants' Searches for Responsive Documents.**

In addition to the above glaring failures, MSHA's failure to produce multiple documents known to exist casts further doubt on the adequacy of its searches.   It is well-established in the D.C. Circuit that those substantial doubts preclude summary judgment in favor of the agency.   In *Scientology*, for example, the NSA claimed it was unable to locate documents responsive to the church's FOIA request after conducting a search of its files.  610 F.2d at 825.  When the church presented evidence that the NSA had provided sixteen responsive documents to the CIA, despite representing that none were available, the D.C. Circuit held that the NSA's conclusory affidavit describing the search was insufficient to demonstrate its adequacy because of the overlooked documents.  *Id.* at 834-835.  The court warned that, "if, in the face of well-defined requests and positive indications of overlooked materials, an agency can so easily avoid adversary scrutiny of its search techniques, [FOIA] will inevitably become nugatory." *Id.* at 836-37.

Here, ample evidence exists that MSHA overlooked responsive materials.   Missing documents known to exist include:

      i.      *April 5th Timeline*

On September 15, 2010, a news article appeared in *The Charleston Gazette*, which referenced a timeline of events prepared by MSHA regarding the Accident (the "Timeline") that was leaked to reporter Ken Ward.  Although MSHA avers that no such Timeline exists, Washington Decl. ¶ 46, Mr. Ward wrote: "A draft MSHA timeline, obtained by the Gazette, shows the agency is trying to 'verify' the 3:02 time it included in its report to the White House" as the time of the initial explosion. SUMF Ex. 22; *see also id.* (noting that "MSHA's draft timeline lists two possible times [for when three survivors of the explosion emerged] — one between 4 p.m. and 5 p.m. and another at 7:26 p.m.") (emphasis added).

Further, MSHA's own guidelines for investigating mine accidents confirm that assembling a

well-documented timeline is a key aspect of all accident investigations.  SUMF Ex. 23 at 19-20; *see also id.* SUMF Ex. 6 ("Lauriski Decl.") ¶ 5 (former Assistant Secretary of Labor for Mine Safety David Lauriski stating that establishing a timeline is a regular practice in mine accident investigation).  Notwithstanding this overwhelming evidence that accident timelines are typical—if not required—components of its Accident investigation, MSHA provides no explanation for why this phantom document keeps reappearing.

ii.      *Humphrey and Wills "Report of Investigation (Underground Coal Mine):  Methane Inundation."*

When discussing the 03/04 methane outbursts, the McAteer Report cites to a "Report of Investigation (Underground Coal Mine):  Methane Inundation" by James R. Humphrey and Fred Wills.  SUMF Ex. 9 at 73 n.9.  MSHA not only has failed to produce this document in response to the 03/04 Methane Outburst Request, but also it <u>failed to even account for the document's existence in its *Vaughn* Index</u>.  *Compare* SUMF Ex. 9 at 69 (citing Humphrey and Wills report), *with* Defs. Ex. C (making no mention of such a report).  This missing document is related to the July 3, 2003 methane outburst and thus plainly responsive to the 03/04 Methane Outburst Request.  *See* Am. Compl. Ex. I (requesting documents related to the July 3, 2003 methane outburst at the Mine).  MSHA Accident Investigator Fred Wills also gave detailed testimony about his work as an investigator of the July 2003 "methane inundation" at the Mine during his June 8, 2010 interview with authorities about his role as an MSHA mine rescue team member in April of 2010.  SUMF Ex. 11 at 19-21.  When an agency can produce a document to one party, and publicly release testimony about the contents of the document, but fails to even acknowledge its existence to another, its search is—by definition—inadequate.  *See Scientology*, 610 F.2d at 835 (inadequate search where NSA produced documents to CIA but not to requestor).

iii.      *Email*

All of the FOIA requests seek electronic information, including email correspondence.  *See*

Amend. Compl. at Exs. A, F n.1, I n.1, M, O, Q, T.   Again, former Assistant Secretary Lauriski demonstrates that MSHA accident investigation teams routinely corresponded electronically regarding matters that would be responsive to several of Performance's FOIA requests.  *See* Lauriski Decl. ¶ 6.  Former MSHA District 4 ventilation supervisor William Lowell "Bill" Ross states that he personally communicated with MSHA officials electronically about ventilation plan "submissions, approvals, and denials."  SUMF Ex. 24 ("Ross Decl.") ¶ 20.

MSHA, however, did not produce a single email in response to four FOIA requests: the MPAS, 1997 Methane Ignition, Bottle Sample, and Timeline Requests.  Performance found in its own records emails between it and MSHA responsive to the MPAS Request.  SUMF Ex. 3.  Thus, emails responsive to, at least, the MPAS Request exist, but were not produced.  Moreover, given the amount of email traffic generated when Defendants were distributing the Wagner Memorandum, it is curious that no email was produced in response to the Timeline, which was similarly leaked to the press.  These shortcomings show that MSHA did not even search email for documents responsive to these four FOIA requests—even though the requests expressly asked for email correspondence.

The productions regarding the Rock Dust and 03/04 Methane Outbursts Requests are similarly deficient.  For the Rock Dust Request, only a single email was produced, which transmitted results for March 15, 2010 samples.  *See* Washington Decl. ¶ 24; Defs. Ex. A.  We know that rock dust samples were taken at the Mine in 2010 on January 26, February 18, and March 15, 16, and 17.  SUMF Ex. 2.   Yet no other emails were produced or listed as withheld on the related *Vaughn* Index.  *See* Defs. Ex. A.  The one email that was produced demonstrates those results were typically transmitted via email.  The Rock Dust Submittal Forms that were produced also confirm that the laboratory results were transmitted to MSHA via email.  *See, e.g.*, SUMF Ex. 2.  Thus, emails besides the one that MSHA produced must exist.

Similarly, MSHA did not produce a single email in response to the 03/04 Methane

Outbursts Request, and only one email appears on the agency's *Vaughn* Index for that request.  *See* Defs. Ex. C at MSHA000251-53.   An outburst that produced at least three formal agency memoranda would have generated some email correspondence.  *See* Lauriski Decl. ¶ 5.  Once again, MSHA did not produce these documents—or account for them on their *Vaughn* indices—even though clear evidence and common sense establish that they exist.

        iv.     *Photographs and Other Visual Depictions*

The MSHA Investigation Handbook states that "[p]hotographs, if conditions permit, and video camera footage <u>shall</u> be taken as a part of the investigation."  SUMF Ex. 23 at 19 (emphasis added).  Further, former Assistant Secretary of Labor for Mine Safety David Lauriski confirms that visual depiction of an accident scene are an integral part of mining accident investigation.  *See* Lauriski Decl. ¶ 4.  Yet no photographs and only one visual depiction have been produced in connection with Performance's FOIA requests, including those regarding the accident investigations into the January 4, 1997 methane ignition and the July 3, 2003 and February 18, 2004 methane outbursts at the Mine.

Thus, several categories of documents that one would expect to contain responsive information are notably absent from Defendants' FOIA productions.   The absence of entire categories of documents that are routinely generated during agency operations demonstrate that Defendants' searches were inadequate.  *See UtahAmerican Energy*, 725 F. Supp. 2d at 83 (finding search inadequate where MSHA's failure to conduct a broad search demonstrated by dearth of materials produced).

In sum, Defendants have failed to set forth the search methodologies and search terms used to locate responsive documents, failed to search all locations where responsive documents would likely be found, failed to produce documents provided to others, and failed to produce whole categories of documents routinely generated during agency operations.   Instead, Defendants'

declarants merely stated that searches were conducted and were adequate. Such conclusory allegations do not satisfy the agencies' burden. Allowing an agency to rest on such unsupported statements to prove it has conducted a search would contravene FOIA's objectives: "If the agency can lightly avoid its responsibilities by laxity in identification or retrieval of desired materials, the majestic goals of [FOIA] will soon pass beyond reach." *Scientology*, 610 F.2d at 837. Rather, these deficiencies demonstrate that Defendants have not met their burden of showing "beyond a material doubt" that they conducted searches reasonably calculated to uncover all documents responsive to Performance's FOIA requests. The Court thus should deny Defendants' motion for summary judgment on the adequacy of their searches.

## V. MSHA MISCONDUCT, INCLUDING DOCUMENT DISTRUCTION, WARRANTS DISCOVERY.

From disingenuously claiming that it did not leak a "memorandum" in the face of overwhelming contrary evidence to executing patently inadequate searches, MSHA's actions regarding Performance's FOIA requests reflect bad faith. However, that is not the end of the agency's misconduct: MSHA official Joseph Mackowiak destroyed documents that may be responsive to Performance's FOIA requests.

Mr. Mackowiak's document destruction, combined with other troubling and questionable MSHA conduct, shows discovery is necessary to probe the extent of MSHA's efforts to frustrate Performance's legitimate FOIA requests. Performance, therefore, moves under Federal Rule of Civil Procedure Rule 56(d) to engage in such discovery. Specifically, Performance seeks to take, at least, the depositions of Mr. Mackowiak and Doris Chambers regarding document destruction, and Mr. Plick and Ms. Washington with regards to search adequacy. If citizens are to know "what their government is up to," misconduct such as that MSHA has engaged in here cannot be tolerated. *Reporters Comm.*, 489 U.S. at 773 (emphasis in original).

Rule 56(d) permits a party to show by affidavit that discovery is necessary to "present facts essential to justify its opposition" to a motion for summary judgment. Courts will grant discovery in FOIA cases if: (1) there are credible allegations of document destruction, *see Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41, 46 (D.D.C. 1998); (2) the agency's claims or affidavits "strain[] credulity," *Lion Raisins, Inc. v. Dep't of Agric.*, 636 F. Supp. 2d 1081, 1108 (E.D. Cal. 2009); or (3) there are serious questions about the adequacy of the agency's search, *Long v. Dep't of Justice*, 10 F. Supp. 2d 205, 210 (N.D.N.Y. 1998). In sum, where an agency may be acting in bad faith, courts will allow discovery. *Lion Raisins*, 636 F. Supp. 2d at 1106-08. Here, although even a single ground warrants discovery, MSHA's misconduct has the dubious distinction of satisfying all three.

*First*, Bill Ross's affidavit, as corroborated by the affidavit of Phillip Ellis, demonstrates that MSHA has literally taken documents out of the office in trash bags to destroy them surreptitiously. This substantiated allegation is sufficient to warrant discovery on its own. *See Jefferson v. Reno*, 123 F. Supp. 2d 1, 2 (D.D.C. 2000) (granting discovery where records "purged"); *Judicial Watch*, 34 F. Supp. 2d at 41, 46 (granting discovery where credible allegations of document destruction made). Mr. Ross is a former MSHA employee who supervised ventilation for all mines in District 4, including the Mine. Ross Decl. ¶¶ 3, 5. Mr. Ross, therefore, is intimately familiar with MSHA's policies and practices, including its policies regarding document retention. *Id.* ¶¶ 6, 8-10. During his more than thirty-year tenure with MSHA, Mr. Ross was responsible for maintaining records related to the ventilation at the Mine. *Id.* ¶ 11. These documents included papers related to the 03/04 methane outbursts, ventilation plans, dust control plans, and other information that is the subject of Performance's FOIA requests. *Id.* When Mr. Mackowiak assumed Mr. Ross's former position at MSHA, Mr. Mackowiak gained Mr. Ross's former secretary, Doris Chambers. *Id.* ¶¶ 14, 17; SUMF Ex. 25 ("Ellis Decl.") ¶ 7. Mr. Mackowiak also gained possession of the same files relevant to the subject FOIA requests that Mr. Ross possessed. Ross. Decl. ¶¶ 11-12.

In June or July 2010—after Performance had filed its initial FOIA requests—Mr. Ross spoke with Ms. Chambers. *Id.* ¶ 16. When the topic of the Mine arose, Mr. Ross asked Ms. Chambers about MSHA documents concerning the 2004 methane outburst that he knew existed from his days with MSHA. *Id.* ¶17. Ms. Chambers responded that Mr. Mackowiak had recently taken a significant quantity of documents relating to the Mine from MSHA's offices in trash bags and destroyed them. *Id.*; Ellis Decl. ¶ 8. Needless to say, sneaking piles of documents out of MSHA offices in trash bags for destruction elsewhere does not comply with MSHA's policies regarding document retention. Ross Decl. ¶¶ 10-11; Ellis Decl. ¶ 8.

This Court has held that "[a]llegations of government officials destroying documents germane to a FOIA request . . . compel judicial intervention on behalf of the requester." *Piper*, 294 F. Supp. 2d at 22 n.1. Mr. Mackowiak's brazen actions, therefore, necessitate this Court's intervention.

*Second*, Defendants' affidavits regarding the Wagner Memorandum and the Timeline strain credulity. Defendants submitted a declaration with the audacious claim that the information it intentionally leaked to the press was not a "memorandum," Plick Decl. ¶ 7, when its own internal emails, as well as the recipients of the "memo," say otherwise, *e.g.*, SUMF Ex. 15 at 1 (noting the message's contents are the "final memo language" (emphasis added)); SUMF Ex. 19 at 1 ("Only the AP go[t] the memo initially; then calls from other outlets prompted the wider distribution." (emphasis added)).

MSHA's allegations regarding the Timeline Request are similarly incredible. It leaked a timeline of April 5th events at the Mine to the press: "A draft MSHA timeline, obtained by the Gazette, shows the agency is trying to verify the 3:02 time it included in its report to the White House." SUMF ¶ 53. Moreover, MSHA's own publicly available accident investigation handbook clearly specifies that it is standard practice to develop a chronology of events as a central part of the

investigation.  *Id.* SUMF Ex. 23 at 19-20.  However, when Performance filed a FOIA request for this document, MSHA put its credibility and the propriety of its conduct at issue by claiming that such a document never existed.

In *Lion Raisins*, the district court similarly considered an agency playing fast-and-loose with the truth.  There, the Department of Agriculture submitted affidavits that "skirt[ed]" the main issues raised by the requester by adroitly using language to avoid stating whether the documents requested actually existed.  636 F. Supp. 2d at 1109.  The court found that such evasion "raise[d] questions about the USDA's good faith" and ordered discovery.  *Id.* at 1109-10.

Here, MSHA's creative redefinition of the word "memorandum" and attempt to claim that a Timeline provided the press does not exist also cannot pass the smell test.  Serious questions about MSHA's "good faith" demand answers.  *Cf. Id.*  Those answers can only be gained by having those responsible for MSHA's misconduct explain their actions under oath.

*Third* and finally, there are serious questions about the adequacy of Defendants' search for responsive documents, as detailed in Section IV, *supra*.  For example, MSHA failed to search email even when the FOIA requests specifically requested such information.  An agency's failure to adequately search for responsive documents is likewise grounds for discovery to determine how many "additional responsive [materials]" exist.  *See Lion Raisins*, 636 F. Supp. 2d at 1112.

This Court should not allow MSHA's misconduct to go unscrutinized.  As criticism of MSHA in the McAteer Report and elsewhere demonstrates, MSHA's actions leading up to and after the Accident have come into question.  The McAteer Report concluded that MSHA "failed its duty as the watchdog for coal miners" because it knowingly allowed "widespread lapses in enforcement," as MSHA Director Joseph Main admitted in a written reported submitted to Congress before the Accident.  SUMF Ex 9 at 77.  The Report describes four additional key failures by MSHA: (1) it "[d]isregard[ed]" the risks posed by methane outbursts, *id.* at 78; (2) it "[o]verlook[ed]" its

responsibility to ensure that ventilation was adequate in the nation's mines, *id.* at 78-79; (3) it "[n]eglect[ed]" to develop new technologies that could improve miner safety by allowing for real-time testing, rather than the three-week delay caused by its decades-old practice of shipping all samples to its laboratory in Mt. Hope, West Virginia, *id.* at 82-83; and (4) it "[a]llow[ed] the U.S. mine safety system to atrophy," *id.* at 83.  In short, MSHA is "shackled" by "cronyism" that has led it to ignore its preeminent mission: protecting the safety of the nation's miners.  *Id.*

An agency that destroys documents, claims publicly released documents do not exist, and conducts a patently inadequate search for responsive documents has not acted in good faith. Discovery is necessary to document the full extent of MSHA's misconduct in this FOIA matter.  *See Jefferson*, 123 F. Supp. 2d at 4, 7 (prohibiting the Department of Justice from invoking Exemption 7 and imposing a $10,000 fine on the Department for destroying records responsive to a FOIA request and inappropriately invoking FOIA exemptions).

## CONCLUSION

For the foregoing reasons, Performance respectfully asks the Court to deny Defendants' Motion for Partial Summary Judgment, grant Performance's Cross-Motion for Partial Summary Judgment, grant Performance's Motion for Discovery, order the release of all the withheld documents, and allow for discovery so that Performance can probe the depths of MSHA's misconduct.

Date:   June 9, 2011

Respectfully submitted,

_/s/_____
Robert D. Luskin, D.C. Bar # 293621
Benjamin D. Wood, D.C. Bar # 478799
Edward D. Gehres, III, D.C. Bar # 478565
Haven G. Ward, D.C. Bar # 976090
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037

Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document with the Court on the Electronic Case Filing (ECF) System on June 9, 2011. I understand that the ECF system will transmit a copy of this document by email to all counsel of record in this matter.

s/ Edward D. Gehres, III
Edward D. Gehres, III
